## STEPHEN G. HAVIGHORST

*v.*

## WILLIS D. BOWEN *et al.*

*Opinion filed February 21, 1905.*

1. MORTGAGES—*release made by deed or by writing on margin of record has same force.* A release of a mortgage on the margin of the record or by a deed has the same force and effect,—that is, to give public notice that the debt is satisfied; and hence a release by deed does not operate to create in the mortgagor, who has quit-claimed his interest, an after-acquired title, which may be availed of as against the quit-claim grantee.

2. SAME—*effect of recording release of trust deed.* Recording of a deed of release, made by the person appointed in the mortgage or trust deed to execute the release, carries with it, as to subsequent *bona fide* purchasers, the legal inference that the release deed has been delivered.

3. SAME—*what not constructive notice that notes are not paid.* The fact that a trust deed is released by the trustee several months before the notes secured thereby are due, does not operate as constructive notice to subsequent mortgagors that the notes are out-

standing in the hands of third parties and are not paid, where, at the time the release is executed, the legal title appears of record in the person to whom the notes were made payable, so that, so far as appears from the record, her interest as mortgagee under the trust deed has merged in the fee.

APPEAL from the Branch Appellate Court for the First District;—heard in that court on appeal from the Superior Court of Cook county; the Hon. JESSE HOLDOM, Judge, presiding.

This is an appeal from the decree dismissing a bill filed by appellant to cancel a release of a trust deed and to foreclose the trust deed.

The instruments were executed under the following circumstances: On August 11, 1890, Euphemia J. Neill, being the owner of two lots in Chicago of which one was improved and the other vacant, together with Robert Neill, her husband, made a trust deed thereon to secure $4000 owing to Brayton S. Harris. August 20, 1892, Harris filed his bill to foreclose said deed and obtained a decree of sale, under which the premises were sold and a master's certificate of sale issued to him October 27, 1892. A few weeks before the certificate issued Mrs. and Mr. Neill had conveyed the premises, by warranty deed, to their son-in-law, Willis D. Bowen, and on November 14, 1892, he and his wife executed a mortgage on the premises to a loan and homestead association, presumably to obtain from it the money with which to redeem from the foreclosure sale to Harris. The mortgage purported to secure an indebtedness of $5400, but no money was ever advanced by the association thereunder. Nevertheless, on January 4, 1893, the association purchased and became the owner of the Harris certificate of sale and subsequently released of record the mortgage to it.

One Louis H. Mahnke and said Robert Neill were partners in the building business. They needed money on a house they were erecting, and on January 21, 1893, Mahnke

borrowed $850 from one Henry Mathes and gave him his collateral note therefor bearing date that day and payable seven months thereafter to the order of said Mathes, with interest at seven per cent per annum, the note reciting that there had been deposited certain collateral and containing the usual power of sale.

On April 3, 1893, said Bowen and his wife executed a trust deed upon the premises (being the one sought to be foreclosed herein) to Robert Neill, trustee, and said Mahnke, successor in trust, to secure Bowen's note of that date for $1800, due in two years and payable to the order of Euphemia J. Neill, and four interest notes for $54 each, payable to the same order in six, twelve, eighteen and twenty-four months. The trust deed was recorded April 13, 1893, and it and the principal and interest notes, after they had been endorsed by Mrs. Neill, were delivered to Mahnke, who, upon maturity of the $850 note he owed Mathes, deposited with him Bowen's note for $1800 and the four interest notes, and the trust deed securing the same, to take the place of the original collateral, which was returned to Mahnke and his note extended for six months. Bowen's notes thus received by Mathes as substituted collateral were purely accommodation paper, but of this Mathes had no knowledge.

Apparently in order to take care of the certificate of sale then in the hands of the loan and homestead association and prevent the same from ripening into a deed, the Neills applied for a loan to the banking house of E. S. Dreyer & Co. For the purpose of enabling them to do so, Bowen, their son-in-law, and his wife, conveyed the premises back to Mrs. Neill by quit-claim deed dated July 23, 1894, and two days thereafter Mr. Neill, without the knowledge of or authority from Mathes, released the trust deed sought to be foreclosed herein and then held by Mathes as part of his collateral, all of which remained with him. At this time the note secured by the trust deed had not matured. The release and quit-claim were recorded August 29, 1894. There is no proof

that the release was delivered to or accepted by Bowen or that he knew of its existence.

On August 8, 1894, there were recorded two trust deeds on the premises from Euphemia J. Neill and her husband to E. S. Dreyer, trustee,—one for $2500 on the improved lot, dated August 4, and the other for $1500 on both lots, dated August 6. The notes secured by the deeds were payable to Adolph Neissen five years after date, and were given to evidence a loan made by the bank to the Neills. Out of the moneys so advanced the latter paid $3840.90 to the homestead association for the Harris certificate. No deed was taken out thereunder, and the same, by lapse of time, has become null and void.

On September 17, 1894, the appellee Catherine Frillman purchased from the bank the $2500 note and the appellee Charles J. Creighton the $1500 note, together with the two trust deeds last mentioned securing them, both paying par value and the accrued interest in cash. Interest on the $1500 note not being paid, Creighton filed his bill to foreclose the trust deed of August 6, 1894, making Mrs. Frillman a defendant thereto. The latter filed her cross-bill to foreclose the trust deed of August 4, 1894. Neither Bowen, nor his wife, nor Mathes, nor Robert Neill, trustee, nor Mahnke, successor in trust, was made a party to the bill or cross-bill. August 12, 1898, a decree of sale was entered upon the bill and cross-bill and the premises sold September 13, 1898, the improved lot to Mrs. Frillman and the other one to Creighton. There was no redemption, and in December, 1899, master's deeds issued to the purchasers, who duly filed them for record and have been in possession of the premises ever since, claiming title under said deeds.

Mahnke's note to Mathes was extended at various times and the last interest paid thereon April 17, 1896, which paid the same to January 21 of that year. Sixty dollars was paid on the principal March 9, 1896. Judgment was entered on the note in favor of Mathes in September, 1897.

On March 6, 1900, Mathes sold to appellant, for the sum of $100, Bowen's note for $1800, his four interest notes and the trust deed securing the same, under and by virtue of the collateral note executed by Mahnke to Mathes. Four months afterward, July 5, 1900, the appellant filed his bill herein, making Creighton, Mrs. Frillman and others defendants, and praying that the release of the trust deed be set aside and the trust deed foreclosed.

Upon the trial in the superior court the complainant's bill, as amended, was dismissed for want of equity, which decree was affirmed on appeal to the Appellate Court for the First District, and now this further appeal is prosecuted.

FRANK LYNCH, and JOHN A. BROWN, for appellant.

CASTLE, WILLIAMS & SMITH, and GEORGE W. HESS, (BEN M. SMITH, of counsel,) for appellees.

Mr. CHIEF JUSTICE RICKS delivered the opinion of the court:

No question is made in this case but that the loans made by Neissen to Mrs. Neill, and secured by the trust deeds to Dreyer as trustee, were *bona fide* transactions, and that concurrent with the making of them was the recording of the release from Robert Neill, as trustee under the trust deed securing the note then held by Mathes as collateral. Nor is it questioned that the appellees Frillman and Creighton purchased the notes from Neissen that were secured by the trust deeds to Dreyer, without any actual notice of the alleged rights of Mathes under the trust deed to Neill. The undisputed evidence is that these appellees never heard of Mathes or knew of his being in any way related to the property, as creditor or otherwise, until a number of years after they had purchased the respective notes held by them and until after foreclosure sale and purchase of the property, the expiration of the redemption and making deeds to them, respectively. The only notice to any of the appellees interested in the prop-

erty, insisted upon by appellant, is the constructive notice arising from the fact that the $1800 note, secured by the trust deed to Neill, lacked eight or nine months of being due at the time Neill released the trust deed securing the same. At the time of the release by Neill of the trust deed securing the note held by Mathes the fee to the land covered by the trust deed was in Mrs. Neill. The $1800 note was also payable to Mrs. Neill, so that, so far as appeared from the record, her interest as mortgagee was merged in the fee held by her.

It was held in *Ogle* v. *Turpin,* 102 Ill. 148, that where one appeared of record as mortgagee and also became possessed of the fee to the land and released the mortgage before the notes were due, although the notes were outstanding in a third party's hands and were not due, the mere fact that the record showed they were not due was not, of itself, such notice as would affect a subsequent *bona fide* mortgagee. In that case Runyan was the mortgagee and received several notes dated July 4, 1874, payable to himself, made by Allen, who was then the owner of the land. Runyan endorsed the notes held by him, before maturity, to Ogle for value and delivered both notes and mortgage to him. In April, 1875, Runyan obtained from Allen a deed to the land, released the mortgage of record that secured the notes he had received from Allen and assigned to Ogle, and borrowed $20,000 on the property. Ogle sought to foreclose the mortgage assigned to him and to have it declared a lien prior to the subsequent mortgage. His bill was dismissed, and in that case it is said (p. 151) : "Neither party denies the validity or fairness of the debt of the other, as against Runyan, or that both were liens on the property when the deed of trust was executed and delivered to Tripp, but the question is whether the bank did not obtain a superior lien by that deed or took their lien subject to Ogle's, and the whole question seems to resolve itself into one of whether there was negligence on the part of the bank. Appellant claims that the bank had no

right to rely alone on the record of the title to the property, which showed that it was clear, but, as the notes given by Allen were not then due, that it should have made inquiry as to whether or not they were paid, and were not, as the fact proved to be, in the hands of an innocent holder, and the bank having failed to exercise ordinary care, it should have its claim postponed to that of appellant. On the other side it is claimed that when it appeared that Runyan had procured Allen's equity of redemption in the property and had released and satisfied his mortgage, the bank had a right to rely on the record and was not bound to make further inquiry, and it took the preferred lien. It has not been suggested of whom the bank should inquire. It inquired of Runyan, and he said the title was good for the property. Had the bank inquired of Allen he could only have given information that he had not paid the notes, but could not have referred the bank to any person as assignee of the notes, and it was not required to go into the commercial world to find a holder. The mortgage showed the notes were payable to Runyan, and when he released the mortgage the bank had the right to presume the notes were paid, or if not, that he had waived and released the mortgage security and was willing to look to the responsibility of the maker or had obtained other security. We think the mere fact that the time of payment had not arrived was not sufficient to put the bank on inquiry or to charge it with notice that the notes had been endorsed to appellant and were unpaid, and to give his claim a preference the bank must have had notice in fact or of circumstances pointing to notice."

The above case is strongly supported by the later case of *Mann* v. *Jummel,* 183 Ill. 523, and *Williams* v. *Jackson,* 107 U. S. 478. The latter case bears a striking resemblance to the case at bar. There a trust deed was given by Mrs. Sweet securing a debt payable to one Augustus Davis for purchase money of real estate sold by him to the mortgagors. Charles Davis and William Stickney were named as trustees. Au-

gustus Davis, for value and before maturity, transferred
and endorsed the notes to one Jackson. The trustees, with-
out the knowledge of Jackson, released the trust deed of rec-
ord, and Mrs. Sweet procured a loan of $5000 from Williams
and secured the same by a trust deed upon the same property.
Neither Williams nor Mrs. Sweet knew, at the time of the
release, Davis was not the holder of the notes. A further
trust deed was made to Augustus Davis to secure certain
notes. The debt secured by the trust deed to Williams not
having been paid, the land was sold, under the power given,
by the trustees to Blockwood, and Jackson filed his bill to
have his notes, and trust deeds securing them, declared a
first lien upon the property, and the relief prayed was granted
him by the Supreme Court of the District of Columbia. The
decree was reversed by the United States Supreme Court,
and it was said (p. 483) : "It was suggested in argument
that as the first deed of trust showed that the notes secured
thereby were negotiable and were not yet payable, and that
the land was not intended to be released from this trust until
all the notes were paid, Williams was negligent in not mak-
ing further inquiry into the fact whether they were still un-
paid. But of whom should he have made inquiry? The
trustees under the first deed, and the original holder of the
notes secured thereby, having expressly asserted, under their
own hands and seals, that the notes had been paid, and Sweet
and wife having apparently concurred in the assertion by ac-
cepting the deed of release and putting it on record, he cer-
tainly was not bound to inquire of any of them as to the truth
of that fact; and there was no other person to whom he could
apply for information, for he did not know that the notes
had ever been negotiated, and he had no reason to suppose
that they had not been canceled and destroyed. To charge
Williams with constructive notice of the fact that the notes
had not been paid, in the absence of any proof of knowledge,
fraud or gross or willful negligence on his part, would be
inconsistent with the purpose of the registry laws, with the

214—7

settled principles of equity and with the convenient trans-
action of business. (*Hine* v. *Dodd,* 2 Atk. 275; *Jones* v.
*Smith,* 1 Hare, 42, and 1 Phillips, 244; *Agra Bank* v. *Barry,*
Irish, 6 Eq. 128, and Law Rep. 7 H. L. 135; *Wilson* v. *Wall,*
6 Wall. 63; *Normen* v. *Towne,* 130 Mass. 52.) The equity
of Williams being at least equal with that of the plaintiffs,
the legal title held for Williams must prevail and he is en-
titled to priority. The decree appealed from is in this respect
erroneous, and must be reversed."

Appellant insists that these cases cannot be held to apply
to the case at bar for the reason that Bowen was the maker
of the trust deed that was released by Neill; that Bowen
conveyed to Mrs. Neill by quit-claim deed merely; that the
fee still stood in Neill as trustee, and that it does not appear
that Bowen knew of the release or that it was even delivered
to him, and that if it had been delivered to him the release
operated as the conveyance of the legal title to him; and it
is pointed out that as the deed to Mrs. Neill was a quit-claim
deed, the legal title afterward obtained by the conveyance of
release by Neill to Bowen did not inure to the benefit of Mrs.
Neill, and that therefore there was no merger of the fee in
the mortgagee, as in the *Ogle case, supra.* It is undoubt-
edly the law that a subsequently acquired title does not inure
to the benefit of a grantee under a quit-claim deed, but we do
not think it is the law that a release made under the provi-
sions of our statute for the purpose of releasing and satisfy-
ing a trust deed and mortgage can be classed along with
those release deeds known to the common law wherein the
grantor conveyed to the life tenant some contingent or rever-
sionary interest in land. By sections 8 and 9 of chapter 95
of Hurd's Statutes provision is made for the release of mort-
gages and trust deeds. By section 8 they may be released
by the mortgagee or trustee, or his successor in trust, by en-
tering satisfaction and release upon the margin of the record
of any mortgage or trust deed, and by section 9 it may be
done by deed. It cannot be that it is the intention of the law

that a release made under one section of the statute shall have a different or greater effect than one under the other section. Both are to effectuate the same purpose,—that is, to give public notice that the debt is satisfied. If Robert Neill had simply entered satisfaction upon the margin of the record of the trust deed in question the position now contended for by appellant would not have been thought of, and the fact that it was released by the other mode pointed out by the statute cannot change the legal effect of the act. The purpose of the sections was the convenience of the transaction of the business, and not that the consequences or the legal effect should be different. A mortgagee or trustee resident of the county seat, or convenient to it, can with little trouble and with no expense enter satisfaction on the record, while one at a greater distance can better afford to make the release by deed.

Whether the release was in fact delivered to Bowen would seem to be not controlling as between these parties. It was made by the person pointed out in the trust deed to make it. It was placed of record, and under our Recording act the fact that it was of record carried with it, as to appellees and innocent third parties, the legal inference that it was delivered. There is quite as much delivery of this deed as there could be of an entry of satisfaction on the margin of the record, and, as we have said, one is given the same legal effect as the other.

Much stress is placed upon the contention that the release here in question was made without the knowledge of Mathes, the holder of the note in question at the time of the release. It may be that Mathes did not know of the release at the time it was made, but his own evidence and conduct tend very strongly to show that he did know of it long before he disposed of the note in question to appellant. If he did know, it was his duty to take timely action to set it aside. But we are not disposed to the view that appellant stands in the same or as good position as did Mathes. It might be that as be-

tween Mathes and appellees there would be equities appealing in his behalf that would not operate or exist in appellant. Appellant became the purchaser of this note six years after its maturity and more than six years after the release of the trust deed of record. He did not take it in the ordinary course of business. If Mathes is to be given credit, he acquired it under the false pretense that he was representing Bowen, the maker. He paid $100 for it, and it is idle to say or to contend that he did not have notice of this release. The transaction itself bore with it evidence that there was something wrong. No sane man would expect to buy a good security, amounting to $2300 face value, for $100. He had notice by the record, and he had notice from the transaction itself, that the security of the trust deed could not be relied on. He says he bought it on speculation, and the circumstances attending the transaction are such that equity will hardly seek to aid.

We think the judgment of the Appellate Court is right, and it is affirmed.                    *Judgment affirmed.*