In re BUCHNER.

(District Court, S. D. Illinois. August, 1912.)

1. MORTGAGES (§ 174*)—PRIORITY—ASSIGNMENT—RELEASE WITHOUT NOTICE OF ASSIGNMENT.

A bankrupt conveyed certain real property to F., receiving back a mortgage to secure notes for part of the price, payable to the bankrupt as trustee, and on the same day F. reconveyed the property to the bankrupt subject to the mortgage, which the bankrupt assumed. The first deed and mortgage were recorded, but the second was not. After this the bankrupt borrowed money from a bank and deposited the notes and mortgage as collateral. The bank did not procure an assignment of the mortgage nor have the same recorded, and after this the bankrupt, needing more money, procured F. to apply to a trust company for a loan on the same property; the bankrupt releasing the first mortgage, and F. executing a new mortgage to the trust company for the new loan, and the trust company having no notice of the deposit of the first mortgage as collateral. *Held*, that the trust company having used due diligence in making its loan, and the bank having failed to procure and record its assignment, the trust company's mortgage was prior in right.

[Ed. Note.—For other cases, see Mortgages, Cent. Dig. §§ 413–416; Dec. Dig. § 174.*]

2. COURTS (§ 367*)—MORTGAGES—PRIORITY—WHAT LAW GOVERNS.

Priority of mortgages executed in Illinois on land located in that state is to be determined in accordance with the decisions of the Illinois Supreme Court.

[Ed. Note.—For other cases, see Courts, Cent. Dig. §§ 958, 959; Dec. Dig. § 367.*]

3. MORTGAGES (§ 169*)—ASSIGNMENT OF FIRST MORTGAGE—FAILURE TO RECORD—NOTICE.

A bankrupt conveyed certain property to F., receiving back a mortgage and notes for part of the price and a reconveyance by which the bankrupt assumed payment of the mortgage. The bankrupt, having recorded the mortgage, but not the reconveyance, deposited the mortgage and notes with the I. Bank as collateral security for a loan. The bankrupt deposited the unrecorded deed with the F. Bank to protect F. against liability on the mortgage, after which the notes and first mortgage were sent by the I. Bank to the F. Bank for collection. The bankrupt, needing more money, procured F. to apply to a trust company for a loan on the same property and procured the same by releasing the first mortgage and having F. execute a new mortgage to the trust company, which sent the proceeds of the loan to the F. Bank for payment to the bankrupt on receiving the new mortgage and a release of the old one. It did not appear either that the notes held by the I. Bank came into possession of the same officer of the F. Bank who acted

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

for the trust company or that knowledge that the notes were unpaid was in the mind of the officer of the F. Bank who conducted the transaction for the trust company. *Held,* that the fact that such notes were in the possession of the F. Bank for collection and were unpaid did not charge the trust company with notice through the F. Bank that the original debt secured by the first mortgage was unpaid.

[Ed. Note.—For other cases, see Mortgages, Cent. Dig. §§ 386–388; Dec. Dig. § 169.*]

4. MORTGAGES (§ 309*)—DESCRIPTION OF MORTGAGEE—MORTGAGEE AS TRUSTEE —RELEASE.

Where a mortgage was executed to a person "as trustee," but did not describe any trust duty or relation, a release executed by the mortgagee without the use of the word "trustee" was available to discharge the mortgage.

[Ed. Note.—For other cases, see Mortgages, Cent. Dig. §§ 864, 870, 899, 900, 902–905, 907–912; Dec. Dig. § 309.*]

5. MORTGAGES (§ 134*)—MORTGAGED PROPERTY—TITLE.

A mortgagor of land in Illinois is the legal owner of the mortgaged property as to all persons except the mortgagee, in whom the legal title vests only for the protection of his rights.

[Ed. Note.—For other cases, see Mortgages, Cent. Dig. § 254; Dec. Dig. § 134.*]

6. MORTGAGES (§ 244*)—EQUITABLE ASSIGNMENT—WRONGFUL RELEASE—DEBT —PRIORITY—SUBROGATION OF BANKRUPT'S TRUSTEE—"EQUITABLE ASSIGNMENT."

Where a bankrupt, having deposited notes secured by a mortgage on real estate with a bank as collateral to a loan, later wrongfully released the mortgage in order to obtain a further loan from a trust company, the pledge of the mortgage constituted an "equitable assignment" thereof within Recording Act Ill. (Rev. St. 1911, c. 30) § 30, providing that instruments affecting title to real property shall be void as to subsequent creditors without notice until filed for record; and hence, creditors of the bankrupt having recovered judgment before notice of the wrongful release of the mortgage, the bankrupt's trustee was subrogated to their rights, which were prior to those of the pledgee bank.

[Ed. Note.—For other cases, see Mortgages, Cent. Dig. §§ 633–655; Dec. Dig. § 244.*

For other definitions, see Words and Phrases, vol. 3, pp. 2434–2437; vol. 8, p. 7652.]

7. MORTGAGES (§ 244*)—PURCHASE OF REAL ESTATE—RECORDED CONTRACT— CLAIM OF VENDEE—EQUITABLE ASSIGNMENT OF MORTGAGE—WRONGFUL RELEASE—"EQUITABLE OWNER."

Vendees under a recorded contract for the sale of a bankrupt's real estate are equitable owners of the land within Recording Act Ill. (Rev. St. 1911, c. 30) § 30, providing that instruments affecting title to real property shall be void as to subsequent creditors without notice, etc., so that their claim for money advanced under the contract, on bankruptcy intervening, was entitled to preference over the claim of an equitable assignee of a mortgage on the property whose assignment was not recorded; the mortgage having been wrongfully released by the bankrupt.

[Ed. Note.—For other cases, see Mortgages, Cent. Dig. §§ 633–655; Dec. Dig. § 244.*]

8. MORTGAGES (§ 244*)—RECORDS (§ 6*)—WRONGFUL RELEASE OF MORTGAGE— NOTICE—RIGHT TO RECORD.

Under the Illinois Recording Act (Rev. St. 1911, c. 30), authorizing instruments which create, alter, or extinguish some right, interest, or power in real estate to be recorded, an equitable assignee of a mortgage, on

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

discovering that the mortgage had been wrongfully released, was entitled to have recorded a notice of that fact, which notice, when recorded, imparted constructive notice, both of the assignment and the wrongful release of the mortgage.

[Ed. Note.—For other cases, see Mortgages, Cent. Dig. §§ 633–655; Dec. Dig. § 244;* Records, Cent. Dig. § 7; Dec. Dig. § 6.*]

In Bankruptcy. In the matter of bankruptcy proceedings of Louis A. Buchner. The referee entered an order determining the priority of liens, and certain creditors filed a petition for review. Modified and affirmed.

Barber & Barber, of Springfield, Ill., for the trustee.

Ellwood & Meek, of Peoria, Ill., for the Peoria Banks.

Logan Hay and John T. Creighton, both of Springfield, Ill., for Sangamon Loan & Trust Co.

Beech & Trapp, for Gallagher & White.

SANBORN, District Judge. The order sought to be reviewed was made upon application of the trustee for leave to sell real estate and have determined the respective rights and interests of parties claiming special liens upon the real estate, and fixing the order and priority of such liens. It appears that there are certain judgments against the bankrupt rendered within four months before adjudication, and that by order of the court the trustee has been subrogated to the rights of the judgment creditors under the provisions of the Bankruptcy Act (Act July 1, 1898, c. 541, 30 Stat. 544 [U. S. Comp. St. 1901, p. 3418]).

By his report filed May 11, 1912, the referee finds and orders that the trustee make sale free of all liens and incumbrances of certain real estate, and that certain other of the real estate shall be applied to specific liens, after due notice, and that the proceeds be distributed in a certain manner. The referee finds that the proceeds of certain of the real estate be retained by the trustee for the benefit of general creditors by reason of the subrogation of the estate to the rights of the judgment creditors. He further orders that the proceeds of certain other of the real estate shall be applied to specified liens thereon in the first instance.

It is unnecessary to state in detail the separate parcels of real estate mentioned for the reason that the referee's finding in respect to priorities governs the whole situation. Such finding is that the Sangamon Loan & Trust Company holds the first lien on certain of the property; second, judgments in favor of New Holland State Bank filed February 3, 1911, for $2,129.25 and $323.61, respectively, and two judgments filed on the same day in favor of T. C. Harry, trustee, for $4,673.10 and $760.30, respectively; third, the claim of White & Gallagher for $1,000 paid by them to the bankrupt as part purchase price of certain of the lands in question; fourth, two judgments of the Carlinville National Bank filed February 8, 1911, for $5,323.46 and $2,780, respectively, a mortgage filed on the same day to the Farmers' State Bank of Middletown, Ill., for $8,000, and a mortgage for $2,000 to Thomas Ryan filed February 10, 1911; fifth, the claims of the Illinois National

Bank and the Interstate Bank & Trust Company, both of Peoria, Ill., upon mortgage notes held by them respectively.

The order of the referee was made February 14, 1912, and filed May 11, 1912. On February 20, 1912, the Interstate Bank & Trust Company, now known as the State Trust & Savings Bank of Peoria, and the Illinois National Bank of Peoria, hereinafter called the "Peoria Banks," filed their joint and several petition for review, objecting to the referee's findings in respect to priorities, and in other respects. A cross-petition for review was also filed by the trustee.

It appears that for some years before the bankruptcy the bankrupt and one Paul D. Foster and others were running a coal mine at Middletown, Ill. The bankrupt, Buchner, was president of the Farmers' State Bank of Middletown, and Foster was a director in the bank. Desiring to raise money to make up losses in the coal business, and not wishing to have Buchner's connection with any loan to become known for fear of injuring the credit of the bank, on January 5, 1907, Buchner made a warranty deed to Foster of all the real property in question and proposed to be sold. As part of the same transaction Foster made a mortgage back to Buchner on the same property to secure the payment of four notes payable to Buchner, trustee, two for $5,000 each and two for $2,500 each, in all $15,000, maturing January 5, 1912, at 5 per cent. per annum. The deed and mortgage were both recorded in the proper office January 9, 1907. The mortgage is in the Illinois statutory form, reciting that the mortgagor mortgages and warrants "to Louis A. Buchner, trustee." The mortgage does not describe the duties of the trustee in any way, and there was no trust relationship between the parties. On the same day Foster reconveyed to Buchner the real estate in question, subject to the mortgage which was assumed by Buchner. By agreement between the parties this deed was not recorded. There was no money consideration for the transaction, nor any apparent change of possession. Buchner retained possession and made leases to third persons.

On July 13, 1907, Buchner borrowed from the Illinois National Bank of Peoria $6,500, referred to in the testimony as the $6,600 debt, and deposited the mortgage and notes with the bank as collateral to the loan and any other indebtedness then or previously owing to the bank. It appears, however, that Buchner owed no other debt at that time, but was indebted upon renewals and other considerations from July 13, 1907, to the time of the bankruptcy in various amounts, at one time as high as $17,500, and at the time of the bankruptcy amounting to $9,689.55. The Illinois National Bank did not procure an assignment of the mortgage from Buchner, or take any other steps to give notice of their security, relying entirely upon the integrity of Buchner as mortgagee.

On July 20, 1907, Buchner deposited the unrecorded deed with the Farmers' State Bank with a memorandum certifying that the deposit was made to protect Foster against any loss or damage on principal or interest of the mortgage notes, and that if it should be necessary to sell the mortgaged property the equity should be applied on any obligation or note due from Buchner to the Farmers' State Bank.

On November 4, 1909, Buchner signed a collateral agreement with the Illinois National Bank, stating that the bank holds $10,000 of the $15,000 Foster loan, and also an indorsement of a note for $2,500 made by the Middletown Coal Company, and one for $2,500 made by Paul D. Foster and Alice Evans Foster, and that said collateral should be held as security for the entire debt. The other note of $5,000 had been previously surrendered by the Illinois National Bank and pledged by Buchner as hereinafter stated.

In August, 1907, the Illinois National Bank returned one of the notes secured by the Foster mortgage for $5,000 to Buchner at his request, and he thereupon pledged this note and other property to the State Trust & Savings Bank under its former name, to secure a loan for $10,000.

On May 15, 1908, more money was needed in the mining operations or to pay debts, and Buchner procured Foster to apply to the Sangamon Loan & Trust Company of Springfield, Ill., for an $8,000 loan to be secured upon the same property covered by the $15,000 mortgage. In his first application Foster represented that the land was free from incumbrances, but on an abstract being procured it appeared that the land was incumbered by that mortgage, and the trust company required that the mortgage should be discharged before making any further loan. During the negotiations for the loan the trust company learned that the real estate was in the possession of Buchner through tenants, and also had knowledge that the notes aggregating $15,000 were unpaid. On June 1, 1908, Foster executed a mortgage for $8,000 upon the land in question to the Sangamon Loan & Trust Company, and on June 10, 1908, the latter wrote a letter to the Farmers' State Bank of Middletown stating that the trust company was making a loan to Foster for $8,000, and that he was to pay one per cent. commission and $5 for expenses; also, that there was inclosed in the letter cashier's check for $7,915, "to be delivered to Mr. Foster upon his delivery to you of the notes and mortgage which he has executed; and also the delivery to you of the release of the mortgage of $15,000 to Mr. Buchner. Please return all these papers to us. Mr. Foster is to sign the inclosed receipt for the amount." Without paying anything upon the notes for $15,000, Buchner executed a release of the mortgage which was delivered to the Farmers' Bank, together with the new notes and mortgage for $8,000. These were sent by the Farmers' Bank to the trust company and were delivered and recorded June 13, 1908. At the time of this transaction in the Farmers' Bank, three of the notes secured by the first mortgage, amounting to $10,000, were in possession of the Farmers' Bank, having been sent there by the Illinois National Bank for collection. It thus appears that the officers of the same bank which acted as agent for the trust company in taking delivery of the new mortgage and release were at the same time agents of the Illinois National Bank in holding the unpaid notes.

On March 26, 1909, Buchner made a mortgage to one Dehority for $6,000 on a small part of the property covered by the $15,000 mortgage, being a strip 150 feet by 1,284½ feet.

February 3, 1911, the New Holland State Bank recovered two judg-

ments against Buchner in the circuit court of Logan county, Ill., for $2,129.25 and $323.61, respectively. On the same day there was recorded two judgments in favor of T. C. Harry, Trustee, v. Buchner, for $4,673.10 and $760.30, respectively.

February 6, 1911, Buchner entered into a contract in writing with D. C. Gallagher and George White stipulating to convey the real estate in question and other property to them free of liens and incumbrances for a consideration of $27,360. This agreement was filed for record in Logan county, Ill., and on the same day a payment of $1,000 was made by the vendees thereon.

February 8, 1911, the Carlinville National Bank recovered two judgments against Buchner for $5,323.46 and $2,780, respectively.

February 9, 1911, the Illinois National Bank and the State Trust & Savings Bank filed in the recorder's office a notice that the $15,000 mortgage was wrongfully released; they having just discovered the fact of the release.

July 30, 1910, Foster gave two mortgages, one to the Farmers' Bank of Middletown for $8,000, and the other to Thomas Ryan for $2,000. These two mortgages are conceded to have been preferential and invalid as against the trustee.

February 15, 1911, the bankruptcy petition was filed, and the adjudication followed on March 1, 1911.

Questions of priority under Illinois law of the various liens referred to were disposed of by the referee, and have been thoroughly presented by counsel. The referee established the following order of priority: (1) The Sangamon Company mortgage; (2) the Dehority mortgage so far as the strip 150 by 1,284½ feet is concerned; (3) New Holland State Bank and Harry judgments for the benefit of the bankrupt estate; (4) White and Gallagher for their payment of $1,000; (5) Carlinville Bank judgment and the preferential mortgages given to Ryan and the Farmers' Bank, for the benefit of the estate; and (6) the Peoria Banks. Excluding the Dehority claim because it is largely secured on land not covered by the Buchner and Sangamon Company mortgage, the total principal sum of the liens is $49,989.72, and the property affected is worth about $20,000. It is therefore evident that under the referee's decision the Peoria Banks will lose their whole debt, unless partly paid as a general claim against the estate. In this way they may obtain the benefit of the order subrogating the trustee to the New Holland Bank judgments, the Harry judgments and the Carlinville Bank judgments. If the Peoria Banks are to be held prior to the Sangamon Company, the latter would still be ahead of all the other claimants who, in turn, would, it is argued, be preferred to the Peoria Banks; thus presenting one of the stock conundrums of the law schools.

[1] 1. At the time it received the mortgage and release, the Sangamon Company had notice of Buchner's possession, and through that was charged with knowledge of his equitable title. It had also recently been informed by Foster that the $15,000 debt secured by the first mortgage given to Buchner was unpaid, but did not know the debt had been assigned or the notes pledged by Buchner, unless such knowl-

edge was to be imputed to it as a matter of law by reason of its selecting the Farmers' Bank, accidentally or as a matter of convenience, as its agent to pay over the money and take delivery of the new mortgage. In addition to this, it knew from the abstract of title and Foster's statement that he was the legal owner, but that Buchner was vested with all other interests as mortgagee in possession and equitable owner by unrecorded deed from Foster. For anything appearing in the evidence the Sangamon Company, taking into account only its actual knowledge, must have supposed that Buchner still held the $15,000 debt, and would not release the first mortgage until that debt was paid, and it must also be charged with the knowledge, from his actual possession of the land, that he was the real owner. So the case is presented of a person about to make a loan supposing in good faith that A., the borrower, is vested with the naked legal title, that B. (Buchner), mortgagee in possession, holder of the original debt and real owner, is willing to have the new mortgage made, and either obtain payment of the old debt from A. (Foster), or waive his claim as first mortgagee and allow the new mortgage to be a prior lien.

Putting ourselves as far as possible in the actual position of the Sangamon Company and the Peoria Banks (holders of the original debt, but without the knowledge of the Sangamon Company), and remembering that the Peoria Banks were negligent in not taking and recording an assignment of the mortgage, it is seen at once, I think, that the Sangamon Company took such reasonable precaution as prudence and good faith dictated. Its knowledge of Buchner's possession without notice that he had assigned the original debt greatly fortifies its position. Had it supposed he was equitable owner alone, knowing he was not a mortgagee in possession, a different case would arise, not here presented. If it had had notice that he had pledged the notes, and thus transferred the mortgage, it might even then, perhaps, be protected as a prior lienor, on the theory that one about to loan money is only required to see that prior liens are discharged. However that may be, ignorant of any assignment, supposing bona fide that Buchner still held the notes and mortgage, the Sangamon Company did everything suggested by any possible or workable standard of reasonable diligence, especially in view of the negligence of the Peoria Banks in failing to procure and record an assignment, and their trusting entirely to Buchner's honesty.

[2] The question is one of Illinois law, and is settled by the rulings of the Supreme Court of that state in favor of the Sangamon Bank. Ogle v. Turpin, 102 Ill. 148; Havighorst v. Bowen, 214 Ill. 90, 73 N. E. 402; Mann v. Jummel, 183 Ill. 523, 56 N. E. 161.

Keohane v. Smith, 97 Ill. 156, is the only case in Illinois fully supporting the position of the Peoria Banks; but the case is tacitly disapproved, if not practically overruled, by the later cases. The facts were that one Sullivan made a mortgage to Runyon to secure a negotiable note for $2,000 due in five years; the money being furnished by Catharine Keohane. Runyon assigned the note to Keohane, and delivered the mortgage to her, without formal assignment or record. About a year later Sullivan borrowed $3,000 from Smith, who en-

gaged Perkins to examine the title. Discovering the Runyon mortgage, Sullivan proposed to pay it out of the $3,000. Sullivan and Perkins paid to Runyon the amount due on the first mortgage, without requiring delivery of the note, and Runyon released the first mortgage, but did not pay the money to Keohane. Thus Perkins, agent for Smith, was grossly negligent in not demanding from Runyon production of the note. A bill being filed to foreclose the first mortgage, the latter was held prior to Smith's lien, mainly upon the ground that Smith knew the first note was not due, and was negotiable, capable of assignment. Having paid the money to discharge it to Runyon without requiring production of the note, he was so negligent that his priority was lost. In Ogle v. Turpin, on the other hand, the facts were similar to Keohane v. Smith, except that Runyon, after negotiating the first mortgage notes, procured a quitclaim deed of the mortgaged property, and then released the first mortgage without paying the notes, making a new mortgage to a third person. The second mortgage was held prior to the first, and the case is substantially the same as the one under consideration. Ogle v. Turpin is approved in the later cases, particularly Havighorst v. Bowen, where the facts were substantially the same as here. The present rule in Illinois is so clearly in favor of the Sangamon Company's lien (apart from the question of agency), and so entirely reasonable, that it should be followed.

[3] 2. Upon the question of agency it appears that the Sangamon Company sent the money for the Foster loan to the Farmers' Bank with definite instruction to pay it over upon receipt of the new mortgage and a release of the old one. At this time the Farmers' Bank had in its possession the unrecorded deed made to Buchner, with a memorandum that it was placed there to protect Foster against any loss on the $15,000 notes. It appears, also, that on February 24, 1908, the Illinois National Bank, at Buchner's request, sent the first mortgage notes held by it to the Farmers' Bank to permit inspection by a possible purchaser. They remained with the Farmers' Bank until about June 5, 1908, about a week before delivery of the Sangamon Company's mortgage. Upon this state of facts it is claimed by the Peoria Banks that the Sangamon Company, through its agent, is imputed with the knowledge that the original notes were unpaid at the time it delivered the money to Foster and the papers to its principal. But it does not appear, either that the notes came into the possession of the same officer who acted for the Sangamon Company, or that knowledge of the notes being unpaid was in mind a week later. Roderick v. McMeekin, 204 Ill. 625, 68 N. E. 473. The agent's authority was also limited quite narrowly. Lowden v. Wilson, 233 Ill. 340, 84 N. E. 245. It is clear that the Sangamon Company was not charged with notice that the original debt was unpaid.

[4] 3. The Buchner mortgage ran to him as trustee, without describing any trust duty or relation, while the release was made by him without the use of the word trustee. He was in no sense a trustee, and the instrument was a pure mortgage, just as though the word had not been employed. The release was therefore in proper form. Even if Buchner was a trustee, he had power to release the mort-

gage lien without payment of the debt, and without consent of its holder. This is held by Havighorst v. Bowen, and the other cases cited in the same connection, except Keohane v. Smith. But the rule does not apply if the subsequent purchaser have notice of the breach of trust. Lennartz v. Quilty, 191 Ill. 175, 60 N. E. 913, 85 Am. St. Rep. 260; Vogel v. Troy, 232 Ill. 484, 83 N. E. 960. ·

The lien of the Sangamon Company should therefore be held prior to that of the Peoria Banks, whose negligence in not recording an assignment of the mortgage enabled Foster and Buchner to defraud them.

The next question is whether the various judgment liens to which the trustee has been subrogated are also to be held prior to those of the Peoria Banks, as decided by the referee.

[5] 4. All the judgments being against Buchner, and not Foster, a preliminary question comes up as to the effect of the Sangamon company's mortgage as a conveyance of the legal title. It is argued that Buchner was only the equitable owner, and that the legal title was outstanding in the mortgagee; therefore the judgment creditors acquired liens only upon the equity of redemption, and had constructive notice of just what his rights were. As against Buchner the released mortgage is, of course, a valid lien, and if he had only an equitable title the judgments would, it is assumed, attach only to his right subject to the first mortgage. This question, however, is not important, for the reason that it is settled in Illinois that the mortgagor is the legal owner as to all persons except the mortgagee. The legal title vests in the mortgagee only for the protection of his interests and only for a single purpose, remaining in the mortgagor for all others. Emory v. Keigham, 88 Ill. 482; Barrett v. Hinckley, 124 Ill. 32, 14 N. E. 863, 7 Am. St. Rep. 331; Seaman v. Bisbee, 163 Ill. 91, 45 N. E. 208; Lightcap v. Bradley, 186 Ill. 519, 58 N. E. 221 (reviewing prior decisions); McFall v. Kirkpatrick, 236 Ill. 281, 301, 86 N. E. 139. The question is complicated, however, by the fact that the record title was in Foster, while the full legal title, as to all persons other than the Peoria Banks and the Sangamon Company, was in Buchner by the unrecorded deed, of which his possession was constructive notice. The judgment creditors were charged with, and may profit by, the fact of Buchner's possession. The case is therefore left just as it would be if there were no apparent outstanding title in Foster.

[6] 5. The Peoria Banks were equitable assignees of the Foster mortgage, and thus have equities prior in time to those of the judgment creditors. They are also prior in right unless in Illinois a different rule has been established, or unless their failure to take and record an assignment was such negligence as to postpone them to the later liens. In Illinois judgment creditors and purchasers stand on equal footing with respect to prior liens or interests of which they have no notice. This is by force of section 30 of the Recording Act (Rev. St. Ill. 1911, c. 30, p. 528), which provides that all deeds, mortgages, and other instruments in writing which are authorized to be recorded shall take effect from the time they are filed for record as to all creditors and subsequent purchasers without notice. This act has been con-

strued to apply only to judgment creditors, those who, "without actual or constructive notice of a prior conveyance or incumbrance, institute such proceedings, or take such steps, as effect a lien on the land before the recording of such conveyance or incumbrance, whether the debt be prior or subsequent to them." Martin v. Dryden, 6 Ill. (1 Gilman) 187, 213; Gary v. Newton, 201 Ill. 170, 186, 66 N. E. 267; Beck Lumber Co. v. Rupp. 188 Ill. 562, 568, 59 N. E. 429, 80 Am. St. Rep. 190.

In regard to the failure of the Peoria Banks to procure and record an assignment of the first mortgage (they having only an equitable assignment due to the pledge of the notes), section 30 provides that title papers shall be void as 'to subsequent creditors, without notice, until the same shall be filed for record. This provision has been construed in Ogle v. Turpin, Mann v. Jummel, and other cases to cover equitable assignments of mortgages such as those held by the Peoria Banks. The trustee, therefore, who has been subrogated to the rights of the judgment creditors, is to be preferred to the Peoria Banks; and, as I understand the record, all the judgments were filed prior to the recording of notice of the wrongful release of the Buchner mortgage.

[7] 6. The claim of White and Gallagher for $1,000 under their recorded contract with Buchner in point of time comes between the New Holland Bank and Harry judgments, filed February 3, 1911, and the Carlinville Bank judgment of February 8, 1911. This claim stands in all respects like a recorded judgment, and for reasons already discussed takes precedence over the Peoria Bank claims. White and Gallagher were equitable owners of the land. Fuller v. Bradley, 160 Ill. 51, 43 N. E. 732; Lombard v. Chicago Sinai Congregation, 64 Ill. 477; Lewis v. Shearer, 189 Ill. 184, 59 N. E. 580. These purchasers were within the protection of the Recording Act. Allen v. Woodruff, 96 Ill. 11; D'Wolf v. Pratt, 42 Ill. 198; Doyle v. Teas, 5 Ill. (4 Scam.) 202; Baltimore, etc., Co. v. Brubaker, 217 Ill. 462, 75 N. E. 523.

Further, the negligence of the Peoria Banks to record an assignment of the first mortgage nullifies the time priority of their equity as against the claim of White and Gallagher. Rohde v. Rohn, 232 Ill. 180, 83 N. E. 465; Lennartz v. Quilty, 191 Ill. 174, 60 N. E. 913, 85 Am. St. Rep. 260; Ogle v. Turpin and Mann v. Jummel, supra.

[8] 7. On February 9, 1911, the Peoria Banks filed in the recorder's office a notice that the first mortgage was wrongfully released, and that they had just discovered that fact. It is argued by attorneys for the trustee that this notice was not such a paper as was authorized to be recorded and therefore did not amount to constructive notice. The Illinois Recording Act authorizes instruments affecting real estate to be recorded; that is, instruments which create, alter, or extinguish some right, interest, or power in the land. The Peoria Banks had an equitable assignment of the mortgage. Their notice asserted this, and this created something which they did not have before. The Recording Act has been liberally construed in Illinois, and I think this paper should be regarded as imparting constructive notice. Deeds are authorized to be recorded only in the county where the land lies. If recorded in any other. they do not operate as constructive notice. St.

John v. Conger, 40 Ill. 535. Resolutions of corporations are not authorized to be recorded. Mullanphy Savings Bank v. Schott, 135 Ill. 655, 667, 26 N. E. 640, 25 Am. St. Rep. 401. A letterpress copy of a paper otherwise recordable is not entitled to record. Lane v. Lesser, 135 Ill. 567, 581, 26 N. E. 522. The same rules applies to an unsigned copy of a recordable paper. Mack v. McIntosh, 181 Ill. 633, 643, 54 N. E. 1019.

The order appealed from should be affirmed, except that the right of the Peoria Banks should date from February 9, 1911, ahead of the two mortgages to the Farmers' Bank and Thomas Ryan. This is upon the assumption that the judgment of the Carlinville Bank was filed for record before the notice filed by the Peoria Banks.